Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| WANDA DÍAZ RAMOS<br><br>Apelante<br><br>v.<br><br>MEDTRONIC PUERTO RICO OPERATIONS, CO. & FULANO DE TAL<br><br>Apelados | KLAN202400570 | *Apelación* Procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Sobre: Ley 80 del 30 de mayo de 1976. Despido Injustificado<br><br>Caso Núm.: PO2023CV01930 |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Salgado Schwarz y el Juez Ronda Del Toro.

Rodríguez Casillas, juez ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 31 octubre de 2024.

Comparece ante nos la Sra. Wanda Díaz Ramos (señora Díaz Ramos o Apelante), para que revoquemos la *Sentencia* emitida el 31 de mayo de 2024, por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI). Mediante dicho dictamen, se dictó una Sentencia Sumaria que desestimó la querella.[1]

Perfeccionado el recurso de apelación, procedemos a **confirmar** la *Sentencia* apelada. Veamos.

**-I-**

El **3 de julio de 2023** la señora Díaz Ramos presentó una *Querella* sobre despido injustificado. Allí, denunció que el 30 de junio de 2023 Medtronic despidió a la Apelante de forma injustificada. Por tanto, reclamó una indemnización por mesada

---

[1] Notificada el 31 de mayo de 2024. Apéndice X de la *Apelación*, págs. 243-256.

ascendente a $64,172.22 y los beneficios marginales que no le fueron liquidados al momento de su despido.[2]

Posteriormente, el **18 de julio de 2023** Medtronic Puerto Rico Operations, Co. (Medtronic o Apelada) presentó *Contestación a la Querella*. Afirmó que la terminación del empleo de la señora Díaz Ramos no fue arbitraria ni caprichosa y respondió al interés de Medtronic de preservar su buen y normal funcionamiento.[3]

Luego de varios trámites procesales, el **6 de marzo de 2024** Medtronic presentó una *Moción de Sentencia Sumaria*. Adujo que las actuaciones de la señora Díaz Ramos fueron desviaciones de calidad graves que pusieron en peligro el producto que se produce en la línea de manufactura donde se desempeñaba. Sustentó los hechos incontrovertidos propuestos con declaraciones juradas, deposiciones y otra prueba admisible.[4]

Por su parte, el **8 de abril de 2024** la señora Díaz Ramos presentó una *Oposición a la Solicitud Sumaria*. Argumentó que está en controversia si la terminación de empleo fue con o sin justa causa. Arguyó, además, que la imputación sobre un "re-work" no aplica porque su función era la de coordinación.[5]

El **9 de abril de 2024**, Medtronic presentó una *Moción Informando Intención de Presentar una Réplica y en Oposición a Solicitud de la Querellante Para Así Hacerlo*. En síntesis, solicitó que no dispusiera de su solicitud de sentencia sumaria hasta tanto presentara una réplica a la oposición de la señora Díaz Ramos.[6] Mediante *Resolución,* el **10 de abril de 2024** el TPI le dio a la Apelada hasta el 24 de abril de 2024 para presentar una réplica.[7]

---

[2] Apéndice I de la *Apelación*, págs. 1-2.
[3] Apéndice II de la *Apelación*, págs. 3-8.
[4] Apéndice III de la *Apelación*, págs. 9-22.
[5] Apéndice IV de la *Apelación*, págs. 212-220.
[6] Apéndice V de la *Apelación*, págs. 221-223.
[7] Apéndice VI de la *Apelación*, pág. 224.

De otra parte, el **14 de abril de 2024** la señora Díaz Ramos presentó una *Oposición a la Moción Informando la Intención de Presentar Réplica*.[8] Ante esto, el TPI redujo el término para que Medtronic presentara su réplica a no más tarde del 18 de abril de 2024.[9]

Conforme a lo ordenado, el **18 de abril de 2024** Medtronic presentó la *Réplica a Oposición a Moción de Sentencia Sumaria*. En síntesis, adujo que la señora Díaz Ramos no logró controvertir los hechos materiales con la suficiencia requerida por nuestro ordenamiento jurídico. También añadió que la Apelante intentó inducir a error al lector al hacer referencias incorrectas a las deposiciones y sacar de contexto los testimonios de los testigos.[10]

Sometido el asunto ante su consideración, el **31 de mayo de 2024** el TPI dictó una Sentencia Sumaria desestimatoria.[11] Mediante esta, declaró *Ha Lugar* la solicitud de sentencia sumaria e hizo las siguientes determinaciones de hechos:

1. *Medtronic es una empresa altamente regulada que se dedica entre otras cosas a la manufactura de artefactos ("devices") médicos de uso humano, de alta tecnología prostética e invasiva, entre otras cosas. Debido a la alta regulación a la que está sujeta la Compañía, los procesos de manufactura deben seguirse estrictamente para cumplir con las obligaciones establecidas con las agencias reguladoras, como la Food and Drug Administration (FDA), entre otras. Véase, Exhibit 1, Declaración Jurada de Milca Velo, ¶5.*
2. *En la planta de Villalba donde trabajaba la querellante se manufacturan, entre otras cosas, componentes de artefactos relacionados con distintas tecnologías utilizadas para tratar condiciones cardiacas. Véase, Exhibit 1, ¶6.*
3. *Específicamente, en la planta de Villalba se manufacturan, entre otras cosas, catéteres utilizados para llevar a cabo ablaciones del corazón para tratar arritmias llamados Artic Front Advance Cardiac Cryoablation Catheter (AFA, también conocido como Cryo) dentro del negocio de Cardiac Ablation Solutions (CAS). Véase, Exhibit 1, ¶7 y Exhibit 2, Deposición de la Querellante a las págs. 27-28.*
4. *Dicho catéter se inserta dentro del cuerpo de los pacientes*

---

[8] Apéndice VII de la *Apelación*, págs. 225-226.
[9] Apéndice VIII de la *Apelación*, pág. 227.
[10] Apéndice IX de la *Apelación*, págs. 228-242.
[11] Apéndice X de la *Apelación*, págs. 243-256.

*para llegar al corazón. Véase, Exhibit 2 a la pág. 76.*

5. *Una vez llega al lugar indicado abre el espacio y utiliza nitrógeno para quemar en frío terminaciones nerviosas en el corazón. Véase, Exhibit 1, ¶9.*

6. *Cualquier falla en la manufactura podría presentar muy alto riesgo al paciente y, por ende, está sujeta a un alto nivel de regulación y control. Véase, Exhibit 1, ¶10.*

7. *Proporcional a la regulación y seriedad del uso y destino de los productos manufacturados, es el grado elevado de calidad exigido del producto; y, la aptitud y eficiencia exigida a los empleados de Medtronic en relación con el desempeño de sus funciones. Véase, Exhibit 1, ¶11.*

8. *La obligación de los empleados de manufactura incluye evitar el riego de incidentes de falta de cumplimiento de productos en la manufactura, en detrimento de la salud y bienestar de los pacientes, la potencial responsabilidad legal y moral, el daño a la imagen de Medtronic y el deterioro del buen y normal funcionamiento de la Compañía. Véase, Exhibit 1, ¶12.*

9. *Igualmente, se les requiere a los empleados un máximo grado de ética y rectitud a la hora de ejercer sus funciones. Véase, Exhibit 1, ¶ [13].*

10. *Los procesos de manufactura de los productos de Medtronic se le sometían al FDA para recibir su aprobación. Véase, Exhibit 1, ¶14 Exhibit 2, a la pág. 50 y 51.*

11. *Así pues, cada uno de productos manufacturados por Medtronic tiene unas instrucciones de manufactura que tienen que seguirse al pie de la letra. Véase, Exhibit 1, ¶15.*

12. *De ocurrir alguna desviación en el proceso de manufactura las piezas manufacturadas tenían que ser decomisadas. Ello conlleva pérdida del costo invertido en la manufactura de la pieza, incluyendo materiales, salarios de los ensambladores, y otros gastos directos e indirectos, que no se recuperarán al tener que decomisar la pieza retrabajada sin autorización y en violación de las normas de Medtronic, lo que afecta el buen y normal funcionamiento de la empresa. Véase, Exhibit 1, ¶16.*

13. *Existía una alternativa para que no fueran decomisadas, lo cual era que luego de una inspección se enviaba a retrabajar o, como se le conoce en la industria, un "re-work". Véase, Exhibit 1, ¶17.*

14. *Para hacer un "re-work" se tenía que incluir al área de "Quality Control". Véase, Exhibit 1, ¶18.*

15. *Si el área de "Quality Control" aprobada que se hiciera el "re-work," entonces se podría continuar con el trabajo. Véase, Exhibit 1, ¶19.*

16. *De la misma manera, si "Quality Control" no aprobaba que se hiciera el "re-work", el mismo no se podía hacer. Véase, Exhibit 2, ¶20.*

17. *Para ello, existía una entidad interna que se conocía como el "Products Review Board." Véase, Véase, (sic.) Exhibit 1, ¶21.*

18. *Dicha entidad era la encargada de dar el visto bueno para poder hacer un "re-work" cuando ocurría una desviación en el proceso de manufactura de un producto o, de lo contrario, desechar el producto. Véase, Exhibit 1, ¶22.*

19. *La querellante comenzó a trabajar en Medtronic a través*

20. *de una agencia de empleo temporero el 12 de julio de 2005. Véase, Exhibit 2 a las págs. 13 y 14.*

20. *Posteriormente, el 8 de enero de 2007 la querellante pasó a convertirse en empleada de Medtronic. Véase, Exhibit 2 a las págs. 14 y 15.*

21. *Al comienzo de su empleo con Medtronic a Díaz se le entregó el Manual de Empleados y las reglas de Conducta de la empresa. Véase, Exhibit 2 a la pág. 15 y Exhibit 3, Declaración Jurada de Edith González ¶33.*

22. *Desde el 2020 aproximadamente la querellante se desempeñaba como team leader en el área donde se manufacturaba el "Artic Front Advance Cardiac Cryoablation Catheter". Véase, Exhibit 2 a las págs. 30 y 31.*

23. *Según admitido por Díaz, como parte de sus funciones como team leader Díaz estaba encargada, entre otras cosas "que el producto salga al tiempo establecido, con la calidad que requiere...". Véase, Exhibit 2 a la pág. 31.*

24. *Según admitido por la querellante, el team leader es la mano derecha del supervisor. Véase, Exhibit 2 a la pág. [31].*

25. *Cuando Díaz indica que el team leader es la mano derecha del supervisor se refiere a que cuando ella se desempeñaba en dicho cargo en el segundo turno ella era quien estaba en efecto a cargo de la producción. Véase, Exhibit 2 a las págs. 33 y 34.*

26. *Para la fecha de su terminación de empleo Díaz trabajaba en el segundo turno. Véase, Exhibit 2 a las págs. 42-43.*

27. *En ese momento había varios supervisores de manufactura que se rotaban entre ellos Jonathan Rodríguez y Karen Feliciano. Véase, Exhibit 2 a la pág. 43.*

28. *Según surge de la investigación llevada a cabo, durante el segundo turno del 20 de abril de 2023, surgió un evento de calidad con uno de los catéteres ("la unidad") en la línea de producción 3. Véase, Exhibit 1 ¶24 (Anejo 1 del Exhibit 1 a la pág. 1 Investigation DOC BS 176).*

29. *Ello fue notificado por la empleada de manufactura CARABY7 (Yolimar Gutiérrez Caraballo) a la querellante. Véase, Exhibit 1 ¶25 (Anejo 1 del Exhibit 1 a la pág. 1 Investigation DOC BS 176).*

30. *Según la información obtenida, dicha unidad presentaba un defecto conocido como Thermal Bond Distal Lip. Véase, Exhibit 1 ¶26 (Anejo 1 del Exhibit 1 a la pág. 1 Investigation DOC BS 176).*

31. *Específicamente, dicho defecto surge cuando hay un problema al fundir con calor un componente de la unidad. Véase, Exhibit [1] ¶27 (Anejo 1 del Exhibit 1 a la pág. 1 Investigation DOC BS 176).*

32. *Dicho defecto hace que el producto no cumpla con los estándares ni las especificaciones requeridas para ser utilizado en los procedimientos cardiológicos. Véase, Exhibit 1, ¶28.*

33. *Cuando el técnico Armando Hernández ("Hernández") procedió a inspeccionar la unidad, la misma no presentaba el defecto antes mencionado. Véase, Exhibit 1, ¶29.*

34. *Hernández le cuestionó a Yolimar Gutiérrez Caraballo sobre la condición de la unidad y esta le indicó que la misma fue evaluada por la querellante. Véase, Exhibit 1*

*¶30 (Anejo 1 del Exhibit 1 a la pág. 1 Investigation DOC BS 176).*

35. *Ello conllevó que Hernández escalara el evento, ya que era posible que hubiese ocurrido un "re-work" no autorizado. Véase Exhibit 1 ¶31 (Anejo 1 del Exhibit 1 a la pág. 2 del memo a la empleada BS191).*

36. *Como parte de la investigación se procedió a segregar la unidad en cuestión. Véase, Exhibit 1 ¶32 (Anejo 1 del Exhibit 1 a la pág. 1 Investigation DOC BS 176).*

37. *Además se entrevistó tanto a Díaz como a Hernández y a Gutiérrez. Véase, Exhibit 1, ¶33.*

38. *Además, se observaron los videos de seguridad del área para tener más claridad en cuanto a lo que había ocurrido con la unidad y el History Log de la unidad en cuestión. Véase, Exhibit 1 (pág. 1 Investigation DOC BS 187).*

39. *De la investigación se concluyó que los procedimientos escritos de Medtronic, conocidos como POD, tienen los controles e instrucciones requeridas para que se cumpla con los requisitos del proceso. Véase, Exhibit 1 ¶34 (Anejo 1 del Exhibit 1 a la pág. 1 Investigation DOC BS 189).*

40. *Además se evaluó el procedimiento POD D0019223 perteneciente a la unidad en cuestión. Véase, Exhibit 1 ¶35.*

41. *Igualmente, se catalogó el incidente como un "No[t] Following Procedures of non-conforming product". Véase, Exhibit 1 ¶37 (Anejo 1 del Exhibit 1 a la pág. 1 Investigation DOC BS 189).*

42. *Además se concluyó que la querellante llevó a cabo un "re-work" no autorizado. Véase, Exhibit 1 ¶38 (Anejo 1 del Exhibit 1 a la pág. 1 Investigation DOC BS 189).*

43. *Como parte de la investigación y durante su deposición la querellante admitió que no recordaba bien lo ocurrido, que no tiene una memoria con exactitud de que fue lo que ocurrió y lo que ella hizo. Véase, Exhibit 1 (BS 173) y Exhibit 2 a la pág. 59.*

44. *Como parte de su contratación a Díaz se le entregó el Manual de Empleados de Medtronic. Véase, Exhibit 2 a la pág. 15 y Exhibit 3, Declaración Jurada de Edith González, ¶33.*

45. *Dicho manual de empleados establece que todos los empleados tendrán, entre otros, los siguientes deberes y obligaciones:*

    *El empleado se verá obligado a cumplir con todas las reglamentaciones, normas, políticas y/o procedimientos razonables y necesarios que la Compañía establezca.*
    *Incurrir en un error(es) en tus funciones, dañar trabajos luego de haber sido notificado y/o adiestrado sobre el modo correcto de hacerlo y/o crear desperdicios innecesarios. Ocultar trabajos defectuosos. Véase, Exhibit 3, ¶34.*

46. *Las normas y políticas aplicables, las cuales eran conocidas por Díaz, establecen que la violación de las políticas de la Compañía, incurrir en errores en las funciones y no observar las reglamentaciones, regulaciones y políticas de la Compañía, y el incumplimiento con el proceso de manufactura, constituyen conducta no aceptable que sujeta al empleado a acción*

*correctiva, incluyendo la terminación de empleo. Véase, Exhibit 3, ¶35.*

47. *Debido a lo sensitivo de los productos manufacturados por Medtronic cualquier evento de un "re-work" no autorizado conlleva el despido del empleado. Véase, Exhibit 3, ¶36.*

48. *Según admitido por la querellante y por sus años de experiencia, la disciplina usual por hacer un "re-work" no autorizado era el despido. Véase, Exhibit 2 a las páginas 84-85.*

49. *Luego de evaluar toda la evidencia recopilada durante la investigación y tomando en cuenta la gravedad de la falta, Medtronic tomó la determinación de despedir a la querellante. Véase, Exhibit 3, ¶[38].[12]*

Inconforme, el **10 de junio de 2024** la señora Díaz Ramos acudió ante esta Curia e imputó la comisión de los siguientes errores:

> *Erró el Foro de Instancia como cuestión de derecho al desestimar por la vía sumaria la querella.*
>
> *Erró el Foro de Instancia como cuestión de derecho al dirimir credibilidad por la vía sumaria.*
>
> *Erró el Foro de Instancia como cuestión de derecho al permitir a la parte Apelada una Réplica a la Oposición a la Moción de Sentencia Sumaria.*

Tras varios trámites procesales, el **12 de julio de 2024** Medtronic presentó una *Oposición a Apelación.* Así, quedó perfeccionado el recurso.

**-II-**

**A.**

En nuestro ordenamiento, el mecanismo de sentencia sumaria procura, ante todo, aligerar la tramitación de aquellos casos en los cuales no existe una controversia de hechos real y sustancial que exija la celebración de un juicio en su fondo.[13] A tal efecto, la Regla 36 de las de Procedimiento Civil dispone el proceso mediante el cual cualquiera de las partes puede solicitar al tribunal que dicte sentencia sumaria a su favor.[14] De esta forma, cuando cualquier parte le solicite al tribunal que el pleito sea resuelto por la

---

[12] *Íd.*, págs. 245-248. Nos percatamos de algunos errores en las referencias a los párrafos de la prueba presentada. Sin embargo, estas fueron corregidas por este Tribunal.

[13] *Rodríguez García v. UCA*, 200 DPR 929, 940 (2018).

[14] Reglas de Procedimiento Civil 2009, 32 LPRA Ap. V., R. 36.

vía sumaria, deberá demostrar en su solicitud, *"la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación"*.[15]

Los hechos esenciales y pertinentes a los que se refieren las Reglas de Procedimiento Civil son los que se conocen como *"hechos materiales"*.[16] Al respecto, un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. Además, la controversia sobre el hecho material tiene que ser real. Esto es, que una controversia no es siempre real o sustancial o genuina. La controversia debe ser de una calidad suficiente como para que sea necesario que un juez la dirima a través de un juicio plenario.[17]

Ahora bien, la Regla 36.3 de Procedimiento Civil, detalla el procedimiento que deben seguir las partes al momento de solicitar que se dicte una sentencia sumaria a su favor.[18] A esos efectos, la mencionada regla establece que una solicitud al amparo de ésta deberá incluir: **(1)** una exposición breve de las alegaciones de las partes; **(2)** los asuntos litigiosos o en controversia; **(3)** la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; **(4)** una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; **(5)** las razones por las

---

[15] 32 LPRA Ap. V., R. 36.1 y 36.2.
[16] *Íd.*
[17] 32 LPRA Ap. V., R. 36.1.; *Ramos Pérez v. Univisión*, 178 DPR 200, 213-214 (2010).
[18] 32 LPRA Ap. V, R. 36.3.

cuales debe ser dictada la sentencia, argumentando el derecho aplicable; y **(6)** el remedio que debe ser concedido.[19]

Presentada una solicitud de sentencia sumaria, la parte que se opone a la concesión de la misma también deberá cumplir con ciertos requisitos preceptuados en la referida regla y deberá argumentar el derecho aplicable a la controversia, ya sea para que el pleito no sea resuelto por la vía sumaria, o para que se dicte sentencia sumaria a su favor.

Es decir, el hecho de que una parte solicite sentencia sumaria no implica que la misma debe ser resuelta a su favor. Esto es así porque la sentencia sumaria puede dictarse a favor o en contra del promovente, según proceda en derecho.[20]

El criterio rector al momento de considerar la procedencia de un dictamen sumario es que no haya controversia sobre los hechos esenciales y pertinentes, según alegados por las partes en sus respectivas solicitudes y/o oposiciones, y que sólo reste aplicar el Derecho.[21]

Es por ello que, una moción de sentencia sumaria adecuadamente presentada solo puede negarse si la parte que se opone a ella presenta hechos fundamentados que puedan mover a un juez a resolver a su favor.[22] Si el juez se convence de que no existe una posibilidad razonable de que escuchar lo que lee no podrá conducirlo a una decisión a favor de esa parte, debe dictar sentencia sumaria.[23] Quiere decir que, en ausencia de una controversia de hechos materiales discernible, corresponderá a los tribunales aplicar el Derecho y resolver conforme al mismo.[24]

---

[19] *Íd.*; *Pérez Vargas v. Office Depot / Office Max, Inc.,* 203 DPR 687, 698 (2019).
[20] *Rodríguez García v. UCA, supra,* a la pág. 941.
[21] *Íd.*
[22] *Íd.*
[23] *Íd.*
[24] *Rodríguez García v. UCA, supra.*

En cambio, el TPI no deberá dictar sentencia sumaria cuando: **(1)** existen hechos materiales controvertidos; **(2)** hay alegaciones afirmativas en la demanda que no han sido refutadas; **(3)** surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material; y **(4)** como cuestión de derecho no procede.[25]

### B.

En primer orden, el Artículo 1 de la Ley Núm. 80 del 30 de mayo de 1976, según enmendada, conocida como la *Ley Sobre Despidos Injustificados* (Ley Núm. 80),[26] establece que un empleado que: **(1)** esté contratado sin tiempo determinado; **(2)** reciba una remuneración, y **(3)** sea despedido de su cargo sin que haya mediado justa causa, tiene derecho al pago de una indemnización por parte de su patrono.[27]

La Ley Núm. 80 fue creada con el propósito de proteger al empleado de actuaciones arbitrarias del patrono e imponer un remedio económico que desalentara la práctica de despedir empleados sin justa causa para ello.[28] A esos fines, crea una presunción de que todo despido es injustificado y le corresponde al patrono, mediante preponderancia de la prueba, demostrar que hubo justa causa para el mismo. [29]

Se considera que es ***justa causa*** para el despido aquella que tiene su origen en alguna razón o motivo vinculado a la ordenada marcha y normal funcionamiento de una empresa y no en el libre arbitrio o capricho del patrono.[30] En específico, el Artículo 2 de la Ley Núm. 80 dispone las circunstancias que constituyen *causa justificada* para el despido de un trabajador.[31] En lo pertinente a la

---

[25] *Vera v. Dr. Bravo*, 161 DPR 308, 333 – 334 (2004).

[26] 29 LPRA sec. 185a *et seq.*

[27] 29 LPRA sec. 185a.

[28] *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 929 (2015).

[29] *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 906 – 907 (2011).

[30] *Srio. del Trabajo v. G.P. Inds., Inc.*, 153 DPR 223, 244 (2001).

[31] 29 LPRA sec. 185(b).

controversia que nos ocupa, dispone que:

> *Se entenderá por justa causa para el despido de un empleado de un establecimiento:*
>
> > a) *Que el obrero siga un patrón de conducta impropia o desordenada.*
> > b) *La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.*
> > c) *Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.*
>
> *[…]*
>
> *No se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. Tampoco se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la ley. En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudicación que correspondiere, a que se ordene su inmediata restitución en el empleo y a que se le compense por una suma igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo.*[32]

Nuestro Tribunal Supremo ha establecido que la lista de ejemplos que contiene el mencionado Artículo 2, persigue ilustrar y orientar en una forma no exhaustiva sobre el tipo de conducta que constituye la razón y motivo justificado para el despido, por estar reñido con la ordenada marcha y normal funcionamiento de una empresa.[33] En ese sentido, los patronos pueden adoptar reglamentos internos y fijar las normas de conducta en el lugar de trabajo y los empleados estarán sujetos a ellos, *siempre y cuando sean razonables.*[34] Por tanto, cuando el patrono logra demostrar que: **(1)** las reglas establecidas para el funcionamiento del establecimiento *son razonables*; **(2)** se le *suministró copia escrita de*

---

[32] *Ibid.* Énfasis nuestro.
[33] *Srio. del Trabajo v. G.P. Inds., Inc., supra,* pág. 244.
[34] *Jusino et als. v. Walgreens,* 155 DPR 561, 573 (2001).

*dichas normas al empleado*; y **(3)** éste violó las normas en reiteradas ocasiones, se constituye la *justa causa* para el despido.[35]

## C.

Nuestro Tribunal Supremo ha sido claro en que un tribunal revisor no debe sustituir su criterio por el del foro de instancia, salvo cuando estén presentes circunstancias extraordinarias o indicios de *pasión, prejuicio, parcialidad o error manifiesto.*[36] La citada norma de deferencia también es aplicable a las *decisiones discrecionales* de los tribunales de instancia. En cuanto a este particular, nuestro Tribunal Supremo ha expresado lo siguiente:

> *No hemos de interferir con los tribunales de instancia en el ejercicio de sus facultades discrecionales, excepto en aquellas situaciones en que se demuestre que este último (1) actuó con prejuicio o parcialidad, (2) incurrió en un craso abuso de discreción, o (3) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo.*[37]

Lo importante al momento de ejercer la función revisora es determinar cuándo un tribunal ha abusado de su discreción, ello, no constituye una tarea fácil.[38] Por lo tanto, para realizarla adecuadamente el Alto Foro Judicial indica expresamente que el adecuado ejercicio de discreción judicial está estrechamente relacionado con el concepto de razonabilidad.[39]

## -III-

De umbral, como foro apelativo estamos en la misma posición que el TPI para atender una solicitud de sentencia sumaria.

**En primer orden**, un análisis de los documentos sometidos nos lleva a concluir que Medtronic cumplió respectivamente con todos los trámites procesales correspondientes a la solicitud de sentencia sumaria. En específico, enumeró los hechos esenciales y

---

[35] *Rivera v. Pan Pepín,* 161 DP R 681, 689 – 690 (2004). Énfasis nuestro.
[36] *Coop. Seguros Múltiples de PR v. Lugo,* 136 DPR 203, 208 (1994).
[37] *Rivera y otros v. Bco. Popular,* 152 DPR 140, 155 (2000).
[38] *Íd.*
[39] *Íd.*

pertinentes, y sostuvo sus alegaciones con prueba admisible en evidencia.

Por su parte, la señora Díaz Ramos presentó una oposición a la moción de sentencia sumaria incoada por Medtronic. Aunque identificó las determinaciones de hechos que no estaban en controversia y las que entendía que sí estaban en controversia, no presentó prueba admisible para controvertirlas.

Ante esto, el TPI emitió la *Sentencia Sumaria* en la que adoptó cuarenta y nueve (49) determinaciones de hechos incontrovertidos. Por lo tanto, incorporamos las determinaciones de hechos materiales incontrovertidas que obran en dicha *Sentencia Sumaria* emitida el 28 de mayo de 2024.

**En segundo orden**, pasemos a atender los planteamientos de errores señalados.

En síntesis, la señora Díaz Ramos plantea que el TPI erró al desestimar por la vía sumaria la querella y permitir a Medtronic una *Réplica a Oposición a Moción de Sentencia Sumaria.*

Al evaluar la totalidad del expediente, concurrimos con el foro de instancia, ya que ciertamente, no existen hechos materiales que deban ser dilucidados en un juicio en su fondo, por lo que no hay impedimento alguno para disponer del caso por la vía sumaria a favor de Medtronic.

En este caso, Medtronic demostró que las reglas establecidas para el funcionamiento del establecimiento son razonables. Además, es un hecho incontrovertido que se le suministró copia escrita de dichas normas a la señora Díaz Ramos. Finalmente, la Apelada nos convenció de que la Apelante violó las normas y, debido a las posibles consecuencias mortales, su acción negligente constituye justa causa para el despido.[40]

---

[40] *Rivera v. Pan Pepín,* 161 DPR 681, 689 – 690 (2004). Énfasis nuestro.

En ausencia de pasión, prejuicio, parcialidad o error manifiesto, es forzoso concluir que el TPI no cometió los errores señalados.

**-IV-**

Por los fundamentos antes expuestos, resolvemos **confirmar** la *Sentencia Sumaria* apelada.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones